UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AVRAHAM GOLDSTEIN et al., | |
| Plaintiffs, | 22 Civ. 321 (PAE) |
| -v- | |
| PROFESSIONAL STAFF CONGRESS/CUNY et al., | OPINION & ORDER |
| Defendants. | |

PAUL A. ENGELMAYER, District Judge:

This case involves First Amendment challenges by professors at a public university to their compulsory inclusion in a bargaining group and consequent representation by a union whose political advocacy the professors claim to abhor. The six plaintiffs are faculty members (the "professors") employed by the City University of New York ("CUNY"). For purposes of collective bargaining, the professors are exclusively represented by the Professional Staff Congress/CUNY (the "PSC"). The professors, however, have denounced the PSC's political advocacy, particularly on issues relating to Israel and Palestine, and have resigned from the PSC. In this lawsuit against the PSC, CUNY, the City of New York (the "City"), and affiliated individuals, the professors claim that New York state law governing public sector unions violates their First Amendment speech and associational rights insofar as it compels them to be represented in collective bargaining by the PSC. Relatedly, they challenge a 2019 amendment to state law, which allows the PSC to forego representing non-members in individualized proceedings, such as investigations, grievances, and disciplinary hearings.

Pending now are motions to dismiss from the PSC, CUNY, and individual defendants Thomas DiNapoli, John Wirenius, Rosemary A. Townley, and Anthony Zumbolo.[1]  These take aim at all three counts in the Complaint: Count One, which challenges the professors' compelled association with the PSC; Count Two, which challenges the professors' compelled association with other faculty and staff in the same bargaining unit; and Count Three, which challenges certain plaintiffs' compelled financial support of the PSC through wage deductions that allegedly continued to be made after their resignations from the PSC.  The motions addressed to Counts One and Two are brought under Federal Rule of Civil Procedure 12(b)(6); those addressed to Count Three are brought under Rule 12(b)(1).

For the following reasons, the Court grants the motions to dismiss Counts One and Two, and denies the motion to dismiss Count Three as moot, on account of concessions by the parties and one plaintiff's acceptance of an offer of judgment that together have significantly narrowed the scope of that Count.

## I.       Background

### A.       Factual Background[2]

#### 1.       New York's System of Exclusive Representation and the PSC

New York State's Public Employees' Fair Employment Act, N.Y. Civ. Serv. Law §§ 200, *et seq.* (the "Taylor Law"), puts in place an exclusive representation model of collective

---

[1] The City also moved to dismiss, Dkt. 59, but as all agreed at argument, the City is not a named defendant as to Counts One and Two, *see* Dkt. 82 ("Tr.") at 10–11, and a plaintiff's acceptance of an offer of judgment and concessions by the parties have mooted the claims for relief from the City as to Count Three. *See infra* Section IV.

[2] This account is based upon the Complaint, Dkt. 1 ("Compl.), and the exhibits incorporated therein. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) ("In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may

bargaining. Under the Taylor Law, the Public Employee Relations Board ("PERB") separates

public employees into distinct "bargaining units"[3] for the purpose of collective bargaining. *See*

*id.* § 207. A bargaining unit comprises a group of public employees that share "a community of

interest" with respect to the terms and conditions of their employment. *Id.* § 207.1(a). A

bargaining unit (or units) is then represented by a union after the union's certification or

recognition by the state. *See id.* § 204.2. That union, under the Taylor Law, then has exclusive

legal authority to speak for all employees in its bargaining unit or units. *See id.* § 204.

On June 16, 1972, PERB certified the PSC—a union—to represent a bargaining unit

containing approximately 30,000 members of CUNY's instructional staff. *See* Compl. ¶¶ 57, 60.

The PSC and CUNY have entered into a Collective Bargaining Agreement ("CBA") and

Memorandum of Agreement ("MOA") that, along with other agreements, today control many

terms and conditions of the employment of the covered instructors. *Id.* ¶ 24; *see also id.*, Exs. A

(CBA), B (MOA).

The bargaining unit today includes the six plaintiffs: Avraham Goldstein ("Goldstein"),

Michael Goldstein, Frimette Kass-Shraibman, Mitchell Langbert, Jeffrey Lax, and Maria

Pagano. *See id.* ¶¶ 58, 60. Each has resigned from the PSC. *See id.* ¶¶ 10–15, 47. Under a 2019

amendment to the Taylor Law, the union owes them, as non-members whom it represents in

---

consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and
documents incorporated by reference in the complaint.").
For the purpose of resolving the motion to dismiss under Rule 12(b)(6), the Court presumes all
well-pled facts to be true and draws all reasonable inferences in favor of plaintiff. *See Koch v.
Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *Nat. Res. Def. Council v. Johnson*, 461
F.3d 164, 171 (2d Cir. 2006).

[3] The Taylor Law uses the terms "bargaining unit" and "negotiating unit" interchangeably. *See,
e.g.*, N.Y. Civ. Serv. Law §§ 208.1(d) (referring to "bargaining unit"), 204.2 (referring to
"negotiating unit"). For the balance of this Opinion and Order, the Court adopts the term
"bargaining unit."

collective bargaining, a duty of fair representation "limited to the negotiation or enforcement of the terms of an agreement with [their] public employer." N.Y. Civ. Serv. Law § 209-a.2(c). However, the PSC is not required to provide representation to non-union members of the bargaining unit, in circumstances involving "questioning by the employer," *id.* § 209-a.2(c)(i), "in statutory or administrative proceedings or to enforce statutory or regulatory rights," *id.* § 209-a.2(c)(ii), or "in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline of a public employee where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate," *id.* § 209-a.2(c)(iii). Further, a union is permitted to "provid[e] legal, economic or job-related services or benefits beyond those provided in the agreement with a public employer only to its members." *Id.* § 209-a.2.

**B.    The CUNY Professors' Relationship with—and Opposition to—the PSC**

The six plaintiffs are full-time instructional staff employed by CUNY. Compl. ¶ 1. The details of their employment vary—some are tenured professors, others are adjunct lecturers, and they teach across several CUNY schools, in subjects including accounting, math, and business. *Id.* ¶¶ 10–15. Each, however, is included in the instructional staff bargaining unit that the PSC exclusively represents. *See id.* ¶ 23.

For two reasons, plaintiffs seek to shed the PSC as their representative in collective bargaining.

First, plaintiffs, all but one of whom identify as Jewish, *id.* ¶ 3, "abhor" the PSC's political advocacy, *id.* ¶ 2, and stated positions on Israel and international affairs, *id.* ¶¶ 3, 27–35. In June 2021, after the PSC adopted a "Resolution in Support of the Palestinian People," *see id.* ¶ 3; *see also id.*, Ex. C. (the "Resolution"), the five Jewish plaintiffs resigned, *see id.* ¶ 36, based on what they termed the PSC's "anti-Semitic, anti-Jewish, and anti-Israel" pronouncements, *id.*

¶ 3. The PSC's political advocacy, they stated, "harms the Jewish plaintiffs and singles them out for opprobrium, hatred, and harassment based on their religious, ethnic, and/or moral beliefs and identity." *Id.* Relatedly, plaintiffs state, since the adoption of the Resolution, PSC members "have held chapter-level discussions, as required by the Resolution," *id.* ¶ 41, on the subjects discussed in the Resolution; these meetings, plaintiffs state, have fomented anti-Jewish sentiment among other members of the union, *id.* Plaintiffs oppose the PSC's use of members' dues, including to support financially the Working Families Party and the Occupy Wall Street movement. *Id.* ¶ 45; *see id.* ¶ 30.

Second, plaintiffs state that the PSC's representation of them in negotiating employment terms and conditions has been low quality, causing them to lose confidence in the union. *Id.* ¶¶ 27, 46. The PSC, they state, has prioritized the economic and employment interests of part-time adjunct professors over those of full-time CUNY faculty and staff. *Id.* ¶ 46; *see id.* ¶¶ 28–33. Plaintiffs also fault the PSC for treating them, as non-members, less favorably than PSC members of the bargaining unit, based on a recent Taylor Law amendment allowing unions to decline to represent non-members of the bargaining unit in individualized proceedings, such as investigations, grievances, and disciplinary hearings. *Id.* ¶¶ 53–56.

As of September 17, 2021, all six plaintiffs had resigned from the PSC. *See id.* ¶¶ 10–15. Nonetheless, plaintiffs claim, the City and DiNapoli continued to deduct dues for three plaintiffs following their resignations—Goldstein, *id.* ¶ 75, Kass-Shraibman, *id.* ¶ 76, and Langbert, *id.*— to transmit to the PSC.

### C.    Procedural History

On January 12, 2022, plaintiffs filed a Complaint against the PSC, CUNY, the City, and four individuals in their official capacities: Wirenius, PERB's chairperson; Townley and Zumbolo, each a PERB member; and DiNapoli, the New York State Comptroller. *See generally*

Compl. The Complaint brought First Amendment claims against the PSC, CUNY, and all individual defendants except DiNapoli; and claims of improper post-resignation dues deductions against the PSC, the City, and DiNapoli. On all counts, plaintiffs seek declaratory, injunctive, and monetary relief, plus attorneys' fees and costs. On March 9, 2022, the Court held an initial conference and granted a joint request to stay discovery pending resolution of the anticipated motions to dismiss. Dkt. 47.

On April 20, 2022, the Court received motions to dismiss and supporting memoranda from: (1) CUNY, DiNapoli, Townley, Wirenius, and Zumbolo (the "State Defendants"), Dkt. 55 ("State MTD"); (2) the PSC, Dkt. 58 ("PSC MTD"); and (3) the City, Dkt. 60. On May 24, 2022, plaintiffs filed a combined memorandum opposing these motions. Dkt. 64 ("Pl. Response MTD"). On June 14, 2022, the State Defendants and the PSC each filed a reply in support of dismissal, Dkts. 66, 68 ("PSC Reply MTD"). The City did not file a reply, but later filed a notice that Goldstein had accepted an offer of judgment under Federal Rule of Civil Procedure 68 as to his claims against the City of improper wage deductions. Dkts. 67, 77 (as refiled).

On September 28, 2022, the Court scheduled argument on Counts One and Two, and ordered the parties to file a joint letter as to Count Three's surviving scope. Dkt. 70. On October 7, 2022, the parties filed that letter. Dkt. 72. On October 26, 2022, the Court held argument on Counts One and Two. On November 2, 2022, the City filed a proposed judgment as to Goldstein's Count Three claim, Dkt. 77, which the Court entered the following day, Dkt. 78.

On November 11, 2022, the parties filed another joint letter apprising the Court of the status of Count Three. Dkt. 80. On November 17, 2022, Goldstein moved for attorneys' fees and costs pursuant to 42 U.S.C. § 1988. Dkt. 84.

## II.   Legal Standards Governing Motions to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558. When resolving a motion to dismiss, the Court must assume all well-pled facts to be true, "drawing all reasonable inferences in favor of the plaintiff." *Koch*, 699 F.3d at 145; *see also A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79–80 (2d Cir. 1993) ("[A]ll allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party."). That tenet, however, does not apply to legal conclusions. *See Iqbal*, 556 U.S. at 678. Pleadings that offer only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III.   Analysis of Plaintiffs' First Amendment Claims (Counts One and Two)

Counts One and Two bring closely related claims. Each challenges the Taylor Law's requirement that the professors be represented in collective negotiations over employment terms and conditions by the PSC, as the exclusive representative of the professors' bargaining unit. The professors contend that this infringes their First Amendment speech and associational rights by compelling them to associate with the PSC (Count One) and the bargaining unit's other instructional staff (Count Two).

In moving to dismiss, defendants contend that settled precedent—*Minnesota State Board for Community Colleges v. Knight*, 465 U.S. 271 (1984) ("*Knight*"), and its progeny—disposes

of these claims.  Plaintiffs dispute that.  And, plaintiffs argue, even if *Knight* foreclosed their claims, the decision in *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448 (2018), compels a reassessment of *Knight*.  The Court reviews these arguments and then addresses, in light of these decisions, plaintiffs' various theories of a First Amendment injury.

### A.    The Pertinent Holding in *Knight*

At issue in *Knight* was a Minnesota statute that, to establish "orderly and constructive relationships" between public employers and their employees, authorized public employees to bargain collectively over the terms and conditions of employment.  *Knight*, 465 U.S. at 273 (quoting Minn. Stat. § 179.61 (1982) (internal quotation marks omitted)).  It provided for the division of employees into appropriate bargaining units.  *See id.* at 273–74.  It also established a procedure, based on majority support within a unit, for the designation of an exclusive bargaining agent for that unit.  *Id.*  Consistent with the statute, a faculty union (the Minnesota Community College Faculty Association ("MCCFA")) was designated the exclusive bargaining representative for the state's community college's faculty, which had been deemed a single bargaining unit.  *Id.* at 275–76.  Twenty professors, who were not members of the union, brought suit against the state board that operated the community college system.  *Id.* at 278.  Before a three-judge district court panel, they challenged, under the First Amendment, the constitutionality both of exclusive representation in bargaining over terms and conditions of employment *and* of a statutory provision requiring the public employer to engage in "meet and confer" sessions, *id.* at 271, with *only* the exclusive representative—that is, the union—"on policy questions relating to employment but outside the scope of mandatory bargaining," *id.* at 273.  The district court panel upheld the requirement of exclusive representation in bargaining, but it struck down the designation of the exclusive representative as the bargaining unit's sole representative at the "meet and confer" sessions regarding policy.  *Id.* at 278–79.

The Supreme Court summarily affirmed as to the statute's designation of an exclusive representative in negotiations over mandatory employment terms and conditions. *Knight v. Minn. Cmty. Coll. Fac. Ass'n*, 460 U.S. 1048 (1983) (summary disposition). But it granted *certiorari* on the professors' challenge to the meet-and-confer provision with respect to non-mandatory policy questions, and, in *Knight*, sustained that provision, reversing the district court panel. The Court rejected the professors' contention that that provision abridged their speech and associational rights and unconstitutionally denied them "a government audience for their views." *Knight*, 465 U.S. at 282, 286. The professors' speech and association rights, the Court held, were not infringed by exclusively empowering the union to negotiate for the state on behalf of the bargaining unit and to express "the faculty's official collective position," *id.* at 276; *see id.* at 288. The statute left the professors "free[] to speak on any education-related issue," *id.* at 288, and "to associate or not to associate with whom they please, including the exclusive representative," *id.*; *see id.* at 276 ("Not every instructor in the bargaining unit is a member" of the association, and "not every instructor agrees with the official faculty view on every policy question."). And the professors had "no constitutional right to force the government to listen to their views," whether "as members of the public, as government employees, or as instructors in an institution of higher education." *Id.* at 283.

The parties disagree over *Knight*'s scope—and relevance—here. Plaintiffs cast *Knight*'s holding as "modest": "that government officials are constitutionally free to choose to whom they listen in nonpublic fora." Pl. Response MTD at 24. The decision, plaintiffs state, speaks only to the constitutionality of denying non-union members of a bargaining group the right to participate in meet-and-confer sessions with the public employer regarding policy. *Id.* It is irrelevant, they contend, to their claims here that "an exclusive representative's authority to speak and contract"

unconstitutionally compels dissenting employees to associate with the union and the other members of the bargaining unit. *Id.* at 23.

For a number of reasons, plaintiffs' attempt to cabin and marginalize *Knight* is unsustainable.

First and most obviously, before it granted *certiorari* on the meet-and-confer issue, the Supreme Court in *Knight* summarily *affirmed* the portion of the decision below that upheld the exclusive bargaining arrangement against a First Amendment challenge.  Rejecting that challenge, the district court panel had held: "The provisions of [the statute] that allow for an exclusive representation system of collective bargaining and that impose duties to 'meet and negotiate' with respect to compensation and other terms and conditions of employment are constitutionally valid on their face and as applied in the community colleges . . . ." *Knight v. Minn. Cmty. Coll. Fac. Ass'n*, 571 F. Supp. 1, 12–13 (D. Minn. 1982), *aff'd in part*, 460 U.S. (summary disposition), *and rev'd in part sub nom.* 465 U.S.  The Court's summary affirmance of that ruling binds lower courts to the judgment. *Mandel v. Bradley*, 432 U.S. 173, 176 (1977); *see also Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975) ("The lower courts are bound by summary decisions by the Supreme Court until such time as the court informs them that they are not." (cleaned up)).  And while "the rationale of the affirmance may not be gleaned solely from the opinion below," *Mandel*, 432 U.S. at 176, the Court, in *Knight,* supplied its reasoning for the summary order. *See Knight*, 465 U.S. at 288–90.

Second, the Court's analysis in *Knight* upholding the exclusive meet-and-confer system referenced the exclusive negotiation process and treated it as logically analogous.  In language that emphasized the similarity between the meet-and-negotiate and meet-and-confer provisions, the Court wrote:

Appellees' associational freedom has not been impaired. Appellees are free to form whatever advocacy groups they like. They are not required to become members of MCCFA . . . . Appellees may well feel some pressure to join the exclusive representative in order to give them the opportunity to serve on the 'meet and confer' committees or to give them a voice in the representative's adoption of positions on particular issues. *That pressure, however, is no different from the pressure they may feel to join MCCFA because of its unique status in the 'meet and negotiate' process, a status the Court has summarily approved.* Moreover, the pressure is no different from the pressure to join a majority party that persons in the minority always feel. Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom.

*Id.* at 289–90 (emphasis added).

Third, a Second Circuit panel in 2016 rejected the narrow construction of *Knight* that plaintiffs propose, in upholding against a First Amendment challenge an exclusive bargaining unit arrangement for public employees. *See Jarvis v. Cuomo*, 660 F. App'x 72, 74 (2d Cir. 2016) (summary order), *cert. denied*, 137 S. Ct. 1204 (2017). Although *Jarvis* was resolved by a non-binding summary order, *see* Local Rule of the Second Circuit 32.1.1(a) ("Rulings by summary order do not have precedential effect."), "[d]enying summary orders precedential effect does not mean that" the Circuit, and by extension a lower court, should "consider[] itself free" to disregard the panel's ruling "in similar cases," *United States v. Payne*, 591 F.3d 46, 58 (2d Cir. 2010) (cleaned up). And here, the *Jarvis* panel's reasons for reading *Knight* to uphold such an arrangement are convincing.

At issue in *Jarvis* was a challenge by 10 operators of home childcare businesses to Article 19-C of the New York Labor Law, which permitted day-care providers to organize and join a union. *See Jarvis*, 660 F. App'x at 74. Under Article 19-C, New York State had certified a union as the exclusive representative for the plaintiffs' bargaining unit. *See Jarvis v. Cuomo*, No. 14 Civ. 1459 (LEK) (TWD), 2015 WL 1968224, at *2 (N.D.N.Y. Apr. 30, 2015), *aff'd*, 660 F. App'x. That arrangement, the plaintiffs claimed, compelled them to associate with the union

and its expressive activities, in violation of their First Amendment rights. The district court expressly rejected the plaintiffs' narrow reading of *Knight, id.* at \*4 ("*Knight*'s holding is broader than Plaintiffs suggest."), stating: "The Supreme Court's language indicates that it broadly considered whether exclusive representation by MCCFA infringed the plaintiffs' associational rights," *id.* In affirming, the Second Circuit panel, quoting the passage reproduced above, similarly held that *Knight* had "foreclosed" claims that exclusive bargaining arrangements, by putting non-members to the choice of joining a union or losing influence over the exclusive representative's advocacy, breached their First Amendment speech and association rights. *Jarvis,* 660 F. App'x at 74.[4]

Fourth, every other Circuit to consider the question has similarly held *Knight* to foreclose speech and association claims by employees within the bargaining group exclusively responsible for negotiating with the public employer. *See, e.g., D'Agostino v. Baker,* 812 F.3d 240, 243 (1st Cir. 2016) (Souter, J. by designation) (non-members' ability to "speak out publicly on any subject" and "free[dom] to associate themselves together outside the union however they might desire" defeated compelled association claim), *cert. denied,* 579 U.S. 909 (2016) (mem.); *Adams v. Teamsters Union Loc. 429,* 2022 WL 186045, at \*2 (3d Cir. Jan. 20, 2022) (reading *Knight* as "only about whether the employees could demand a forum with their employer" would be

---

[4] The Circuit had previously reached a compatible conclusion in the context of private sector employees. *See Virgin Atl. Airways, Ltd v. Nat'l Mediation Bd.,* 956 F.2d 1245 (2d Cir.), *cert. denied,* 506 U.S. 820 (1992). The employees there objected to the certification of a union as their exclusive representative, on the ground that, due to the improper consideration of votes by ineligible persons, the union chosen to represent the bargaining group had been selected by less than a majority of the eligible workers. *See id.* at 1247–49. Rejecting a First Amendment challenge, the Circuit noted that the right of free association "has never been held to mandate 'majority rule' in the labor relations sphere," adding, in language apposite to the situation addressed in *Knight*: "If the First Amendment did protect individuals from being represented by a group that they do not wish to have represent them, it is difficult to understand why that right would cease to exist when a majority of the workers elected the union," *id.* at 1251–52.

"simply at odds with what it says," as "*Knight* foreclose[d] the First Amendment [speech and association] challenge"), *cert. denied*, 2022 WL 4651460 (mem.); *Akers v. Md. State Educ. Ass'n*, 990 F.3d 375, 382 n.3 (4th Cir. 2021) (*Knight* "foreclosed" a freedom of association claim, in holding that Minnesota's exclusive representation regime "did not violate speech and associational rights of those who were not members of [the] organization selected as exclusive representative"); *Thompson v. Marietta Educ. Ass'n*, 972 F.3d 809, 813–14 (6th Cir. 2020) (*Knight* precluded First Amendment compelled speech and association challenge to exclusive representation; plaintiff's attempt to distinguish *Knight* was "such a cramped reading of *Knight*" that it "would functionally overrule the decision"), *cert. denied*, 141 S. Ct. 2721 (2021) (mem.); *Bennett v. Council 31 of the AFSCME*, 991 F.3d 724, 734–35 (7th Cir. 2021) (rejecting argument that *Knight* "addressed only whether the plaintiffs could force the government to listen to their views," as "*Knight* speaks directly to the constitutionality of exclusive representation," and barred the free speech and association claim), *cert. denied sub nom. Bennett v. AFSCME, Council 31*, 142 S. Ct. 424 (2021) (mem.); *Hill v. Serv. Emps. Int'l Union*, 850 F.3d 861, 864 (7th Cir. 2017) (per *Knight*, an "exclusive-bargaining-representative scheme is constitutionally firm" where non-members "are also free to form their own groups, oppose the [union], and present their complaints to the State"), *cert. denied*, 138 S. Ct. 446 (2017) (mem.); *Bierman v. Dayton*, 900 F.3d 570, 574 (8th Cir. 2018) (*Knight* "summarily affirmed the constitutionality of exclusive representation for subjects of mandatory bargaining" and thereby foreclosed the claim that the "'mandatory agency relationship' between [public employees] and the exclusive representative . . . violates their right to free association under the First and Fourteenth Amendments"), *cert. denied sub nom. Bierman v. Walz*, 139 S. Ct. 2043 (2019) (mem.); *Mentele v. Inslee*, 916 F.3d 783, 788 (9th Cir. 2019) ("*Knight* is the most appropriate guide" for a

compelled association challenge and forecloses First Amendment challenge), *cert. denied sub nom Miller v. Inslee*, 140 S. Ct. 114 (2019) (mem.); *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 969 (10th Cir. 2021) (*Knight* "found exclusive representation constitutionally permissible" and "thus belies [the plaintiff]'s claim that exclusive representation imposes [compelled speech and association] in violation of the First Amendment"), *cert. denied*, 142 S. Ct. 423 (mem.).

The Court accordingly holds—following all courts of appeals to have addressed the issue—that under *Knight*, the "exclusive representation by public-sector labor unions does not violate the speech or associational rights of non-union members." *Peltz-Steele v. UMass Fac. Fed'n, Loc. 1895 Am. Fed'n of Tchrs., AFL-CIO*, 21 Civ. 11590 (WGY), 2022 WL 3681824, at *6 (D. Mass. Aug. 25, 2022). And although plaintiffs declare that "*Knight* cannot bear [such] incredible weight," Pl. Response MTD at 24, they do not cite any contrary authority.

### B.      Whether *Knight* Controls Here

*Knight* unavoidably controls here. The facts here are on all fours with those in *Knight*—indeed, strikingly so. With the exception of a 2019 amendment to the Taylor Law, addressed *infra* Section III.D.4, plaintiffs have not identified any salient difference between the Minnesota statute upheld in *Knight* and New York's Taylor Law. Both statutes prescribe exclusive bargaining with respect to public sector employees, *see* N.Y. Civ. Serv. Law § 204; *Knight*, 465 U.S. at 271; utilize a "bargaining unit" feature, *see* N.Y. Civ. Serv. Law § 204.2; *Knight*, 465 U.S. at 271; and do not compel public employees to join the union elected by the majority of the bargaining unit, *see* N.Y. Civ. Serv. Law § 209-a.2(a); *Knight*, 465 U.S. at 289. And like *Knight*, this case consists of a First Amendment challenge by professors at a public university who do not belong to the union selected by a majority of instructors to represent the bargaining unit in collective bargaining. *Compare Knight*, 465 U.S. at 298, *with* Compl. ¶¶ 10–15, 47.

C.    The Impact of *Janus* on *Knight*

Plaintiffs next argue that the 2018 decision in *Janus* repudiates, at least implicitly, the holding in *Knight*, requiring its reassessment. This, too, is wrong.

*Janus* addressed the mandatory payment of agency fees—a portion of union dues—by non-members who are part of an exclusive bargaining unit of public employees. The plaintiff, Janus, had resigned from the public sector union that had been majority-selected to represent the bargaining unit. *See Janus*, 138 S. Ct. at 2460–62. Janus argued that, insofar as he had not consented to the union's representation of him, forcing him to subsidize the union breached his First Amendment rights. *Id.* at 2462–68. Michigan's labor law permitting such deductions had been based on the Supreme Court's decision in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), which had upheld the charging by public sector unions of non-members for a proportionate share of union dues attributable to a union's activities as its collective-bargaining representative. Ruling for Janus, the Supreme Court overturned *Abood*. It held that where "public employees are forced to subsidize a union, even if they choose not to join and strongly object to the positions [of] the union[,] . . . [such] violates the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." *Janus*, 138 S. Ct. at 2459–60.

Although contesting the mandatory payment of agency fees by non-members, Janus's claim did not, more broadly, challenge the exclusive representation model for public employees, under the First Amendment or otherwise. Plaintiffs here nonetheless argue that *Janus* is a doctrinal sea-change that repudiates *Knight* or logically calls it into doubt. *See* Pl. Response MTD at 21–22. In contrast, defendants depict *Janus* as consistent with, and indeed confirming, *Knight*'s vitality. *See* State MTD at 12; PSC MTD at 10.

Plaintiffs are again incorrect. *Janus* repudiated existing law insofar as it overturned *Abood*, the 1977 precedent that had upheld extraction of agency fees from non-members against a First Amendment challenge. But although the decision thus reflects heightened sensitivity to the First Amendment issues implicated by the payment of such fees, *Janus*, as a brief review reflects, cannot fairly be read more broadly to impugn the exclusive representation model of public sector exclusive bargaining upheld in *Knight*.

*Janus* does not cite *Knight*. And *Janus* explicitly assumed that the "labor peace" accomplished by the exclusive representation of public employees was a "compelling state interest," insofar as it avoided the "confusion" and "conflicting demands" that would ensue were a public employer compelled to negotiate with multiple unions on behalf of members of the same bargaining unit. *Janus*, 138 S. Ct. at 2465 (cleaned up). The Court further emphasized that the "designation of a union as the exclusive representative of all employees in a unit" is not "inextricably linked" with "the exaction of agency fees," *id.* Its decision invalidating the extraction of agency fees instead turned on the non-member's compulsory subsidization of a union whose views and values he did not share. *See, e.g., id.* at 2463–64 ("Compelling individuals to mouth support for views they find objectionable violates [a] cardinal constitutional command," and "[c]ompelling a person to subsidize the speech of other private speakers raises similar First Amendment concerns"). That interest is not implicated by the inclusion of a non-member in a bargaining unit. *Janus* therefore drew the bounds of its ruling as follows:

> It is . . . not disputed that the State may require that a union serve as exclusive bargaining agent for its employees—itself a significant impingement on associational freedoms that would not be tolerated in other contexts. We simply draw the line at allowing the government to go further still and require all employees to support the union irrespective of whether they share its views.

*Id.* at 2478. Lest the point be unclear, the Court added: "States can keep their labor-relations systems exactly as they are," *id.* at 2485 n.27, including by "requir[ing] that a union serve as exclusive bargaining agent for its employees," *id.* at 2478. *See also id.* at 2471 n.7 ("[W]e are not in any way questioning the foundations of modern labor law.").

Unsurprisingly, every court of appeals to address *Knight* since *Janus* has upheld state systems of exclusive representation against First Amendment challenges. *See, e.g., Reisman v. Associated Facs. of Univ. of Me.*, 939 F.3d 409, 414 (1st Cir. 2019), *cert. denied*, 141 S. Ct. 445 (2020) (mem.); *Adams*, 2022 WL 186045, at *2 ("[W]e hold that, consistent with every Court of Appeals to consider a post-*Janus* challenge to an exclusive-representation law, the law does not violate the First Amendment."), *cert. denied*, 2022 WL 4651460 (mem.); *Oliver v. Serv. Emps. Int'l Union Loc. 668*, 830 F. App'x 76, 80–81 (3d Cir. 2020); *Akers*, 990 F.3d at 382 n.3 (First Amendment challenge to exclusive representation barred by *Knight*); *Thompson*, 972 F.3d at 812 (noting that "when the Supreme Court decided *Janus*, it left on the books . . . *Knight*," which "directly controls the outcome of" the First Amendment claim against exclusive representation), *cert. denied*, 141 S. Ct. (mem.); *Bennett*, 991 F.3d at 727 (plaintiff "cannot establish that *Janus* rendered the longstanding exclusive-bargaining-representative system of labor relations unconstitutional"), *cert. denied sub nom.*, 142 S. Ct. (mem.); *Ocol v. Chi. Tchrs. Union*, 982 F.3d 529, 532–33 (7th Cir. 2020) ("[The *Janus*] Court gave no indication that its ruling on fair-share fees necessarily undermined the system of exclusive representation."), *cert. denied*, 142 S. Ct. 423 (2021) (mem.); *Uradnik v. Inter Fac. Org.*, 2 F.4th 722, 726 (8th Cir. 2021) (First Amendment challenge barred where plaintiff's claim "look[ed] very similar to a claim brought by a different group of Minnesota professors in *Knight*"); *Bierman*, 900 F.3d at 574 (*Janus* did not overrule *Knight*; "where a precedent like *Knight* has direct application in a case, [courts]

should follow it, even if a later decision arguably undermines some of its reasoning"), *cert.*

*denied sub nom.* 139 S. Ct. (mem.); *Mentele*, 916 F.3d at 789 (*Janus* did not overrule *Knight*, and

the court must "leave to the Supreme Court the prerogative of overruling its own decisions even

if subsequent decisions call into question some of that precedent's rationale" (cleaned up)), *cert*

*denied sub nom.* 140 S. Ct. (mem.); *Hendrickson*, 992 F.3d at 969 (*Janus* "reinforces" the

holding in *Knight* that exclusive representation is constitutionally permissible), *cert. denied*, 142

S. Ct. (mem.).  There have not been any dissents to these decisions.[5]

 Accordingly, *Janus* does not disturb *Knight*, or assist plaintiffs' cause.

### D. Plaintiffs' First Amendment Claims in Light of *Knight*

 In light of *Knight*'s continuing vitality and its unambiguous approval of exclusive

bargaining arrangements as against First Amendment challenges, plaintiffs' free speech and

association claims are necessarily foreclosed by binding precedent.  Although plaintiffs are at

liberty to seek reassessment on appeal, the Court, under the doctrine of vertical *stare decisis*,

lacks authority to depart from such precedent.[6]  That is so whether plaintiffs' First Amendment

claim is viewed as challenging their compelled association with the PSC (Count One) or with the

bargaining unit's other members (Count Two).

---

[5] The Sixth Circuit, although holding the plaintiff's compelled association claims barred, opined that "*Knight*'s reasoning conflicts with the reasoning in *Janus*." *Thompson*, 972 F.3d at 814, *cert. denied*, 141 S. Ct. (mem.).  But the Circuit recognized that, because the Supreme Court had not overruled *Knight*, it lacked authority to treat *Knight* as no longer good law.  *Id.*

[6] "[V]ertical *stare decisis* is absolute, as it must be in a hierarchical system with 'one supreme Court.'" *Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring in part) (quoting U.S. Const., Art. III, § 1).  This doctrine "provides little, if any, leeway for a district court judge to stray." *Dodge v. Cnty. of Orange*, 282 F. Supp. 2d 41, 80 (S.D.N.Y. Sept. 9, 2003); *see also Palin v. N.Y. Times Co.*, 482 F. Supp. 3d 208, 215 (S.D.N.Y. Aug. 8, 2020), *modified*, 510 F. Supp. 3d 21 (S.D.N.Y. Dec. 29, 2020).

In the interest of completeness, the Court nonetheless evaluates why, under governing doctrine, the four theories of a First Amendment violation that plaintiffs have ventured in this lawsuit do not state a viable claim. As explained, the first three of these are foreclosed, either literally or effectively, by *Knight*. The fourth concerns a recent amendment to the Taylor Law.

### 1. Compelled Association with the PSC

Plaintiffs' first theory is that New York impermissibly compels them to associate with the PSC and its speech by forcing them to accept the PSC as their mandatory agent for speaking and contracting with CUNY. Pl. Response MTD at 13–14. The association with the PSC is particularly toxic, plaintiffs plead, because the PSC has expressed abhorrent anti-Semitic and anti-Zionist views on extraneous (*i.e.*, non-employment) matters. Compl. ¶ 3. Plaintiffs claim that this further causes them to lack confidence in the PSC to fairly represent the bargaining unit in collective bargaining over the terms and conditions of employment. *Id.* ¶ 43.

Although plaintiffs' dismay at being situated in a bargaining unit led by persons with views they find reprehensible is undeniably sympathetic, *Knight* and its circuit-court progeny squarely foreclose such as a basis of a viable First Amendment claim. As these cases reflect, the remedies for a member of the bargaining unit are instead to resign from the union,[7] to decline to subsidize the union as *Janus* now permits, and/or to otherwise disassociate from the noxious speech. An employee may also seek to vote out the union as representative of the bargaining unit, to work within the union to change its leadership, or to pursue, through appropriate channels, claims of a denial of fair representation. But these authorities do not support a First Amendment right for the minority members to bargain separately with the employer on account

---

[7] The Complaint alleges, in fact, that plaintiff Lax resigned from the PSC after his complaints against the union before the Equal Employment Opportunity Commission prevailed in various respects. These allegedly resulted in determinations that certain defendants "discriminated" and "retaliated" against Lax on the basis of his religion. Compl. ¶ 32.

of their discomfort with the union's views. *See, e.g.*, *D'Agostino*, 812 F.3d at 244 ("[T]he freedom of the dissenting appellants to speak out publicly on any union position further counters the claim that there is an unacceptable risk the union speech will be attributed to them contrary to their own views; they may choose to be heard distinctly as dissenters if they so wish, and as we have already mentioned the higher volume of the union's speech has been held to have no constitutional significance."), *cert. denied*, 579 U.S. (mem.); *Mentele*, 916 F.3d at 788 (no First Amendment violation "where plaintiff raises concern that a union she dislikes is speaking for her"), *cert denied sub nom.* 140 S. Ct. (mem.).

### 2.     Compelled Association with the Bargaining Unit

Plaintiffs' second theory is that New York impermissibly compels them to associate with "tens of thousands of other instructional staff" in the same bargaining unit, despite the fact that many of these other instructors "do not share [plaintiffs'] beliefs or are overtly hostile to them." Compl. ¶ 48; *see id.* ¶¶ 99–100; Pl. Response MTD at 16 (claiming that New York has interfered with the professors' "right to select with whom they join in a common endeavor").

Plaintiffs depict this theory of a First Amendment violation as an open question, insofar as the challenge by the Minnesota professors in *Knight* was based on dissident instructors' compelled association with the union itself, as opposed to with other members of the bargaining group, and ensuing cases have had a similar factual basis. As a formal matter, such may be so. But even if this feature distinguished this entire line of cases, it would be of no moment. That is because the logic of *Knight* and its progeny would equally dispose of this theory of a First Amendment violation.

By definition, a bargaining unit is comprised of a large number of employees—even tens of thousands, as with plaintiffs' unit. These masses cannot be expected to agree on every issue, employment-related or otherwise, any more than a dissident member of the bargaining unit can

be expected invariably to share the views of the bargaining representative elected by the unit. And like the union and its leadership, the other members of a bargaining unit have First Amendment rights of expression. The analysis in *Knight*—holding that a dissident within the bargaining group does not have a First Amendment right to bargain separately with the public employer so as to enable them to dissociate from others whose views they do not share—equally applies to this theory of plaintiffs. And, taken to its logical extreme, plaintiffs' theory would entitle every single member of a bargaining group to negotiate separately with the public employer over terms and conditions of employment, lest the employee be clustered with another whose views he or she found disagreeable, a point plaintiffs conceded at argument. *See* Tr. at 54–56. Under the case law, that thesis is untenable. *See Knight*, 465 U.S. at 291 ("The goal of reaching agreement makes it imperative for an employer to have before it only one collective view of its employees when 'negotiating.'"); *see also Oliver*, 830 F. App'x at 80–81 (government's interests served by "choos[ing] to listen to a union while ignoring nonmembers without infringing upon the nonmembers' rights"); *Peltz-Steele*, 2022 WL 3681824, at *9 ("Although private in nature, exclusive union representation echoes the representative structures of American democracy both in its assets and its imperfections, fostering a majoritarianism tempered by constraints of fair representation but which inescapably yields a dissenting minority.").

In any event, this theory fails for a separate reason. The case law does not support that including a person in a bargaining group alongside other people is an act of "expressive" quality implicating the First Amendment. The decision in *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47 (2006), is instructive. Law schools there challenged a federal law (the "Solomon Amendment") requiring that if any part of an institution of higher

education denied military recruiters access equal to that provided other recruiters, the entire institution would lose certain federal funds. *Rumsfeld*, 547 U.S. at 51. In the part of its decision pertinent here, the Supreme Court rejected the law schools' challenge, finding that "the schools are not speaking when they host interviews and recruiting receptions." *Id.* at 64.[8] "[T]he conduct regulated by the Solomon Amendment," the Court held, "is not inherently expressive" because it requires only "explanatory speech" to communicate its message. *Id.* at 66. The Court added: "Compelling a law school that sends scheduling e-mails for other recruiters to send one for a military recruiter is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto 'Live Free or Die,' and it trivializes the freedom protected in [*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943)] and [*Wooley v. Maynard*, 430 U.S. 705 (1977)] to suggest that it is." *Id.* at 62.

So, too, here. The Complaint does not allege that CUNY's professors are required to "say" anything, or take any action,[9] as members of the bargaining unit, beyond being bound by the terms and conditions negotiated on their behalf by the unit's elected exclusive representative, the PSC. It is thus not of any moment, under the First Amendment, that other members of the bargaining unit "do not share their same economic interests," Compl. ¶ 48, "do not share their beliefs," *id.*, and "are overtly hostile to them," *id.* That people with different viewpoints are in a

---

[8] The law schools separately argued that the Solomon Amendment placed an unconstitutional condition on their receipt of federal funds. *See Rumsfeld*, 547 U.S. at 57–66. The Court's assessment of that claim is not relevant here.

[9] Although the Complaint alleges that the Resolution "requir[es] chapter-level discussion of possible support by PSC," Compl. ¶ 34, for the Palestinian-led "Boycott, Divestment, Sanctions" movement against Israel, the Complaint does not allege that the professors are obligated to attend or participate in those discussions. Nor does the Resolution's text suggest an obligation of all union members, let alone non-union members, to participate in these discussions. *See* Resolution at 1–2.

common unit for purposes of collective bargaining does not associate each—within the meaning of the First Amendment—with the viewpoints of the others, any more than the travelers on a common public carrier such as a municipal bus or train, or the students in a common public school, are associated with one another's ideas or perspectives.[10]  The Complaint here does not plead any concrete facts why outsiders would reasonably impute an association between a professor and any of the many viewpoints held among the approximately 30,000 other instructors in the bargaining unit.  Just as the Solomon Amendment was held not to infringe on the law school's associational rights even if the school found the military recruiter's messages in interviews, receptions, bulletin boards, and emails "repugnant," *Rumsfeld*, 547 U.S. at 70, that the CUNY professors vehemently disagree with the messages of others in the bargaining unit does not bespeak a cognizable injury under the First Amendment.

### 3.   The PSC as a Hostile Political Group

Plaintiffs' third theory—a variant of the first—casts the PSC as the equivalent of "a hostile political group," Pl. Response MTD at 14, with which New York is forcing the professors

---

[10] For this reason, the compelled speech cases that plaintiffs cite are far afield.  Plaintiffs, as pled, have not been required to carry, endorse, or embrace any message of another—whether the PSC or its members.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp.*, 515 U.S. 557 (1995) (state may not require organizers of private parade to include among marchers a group imparting message the organizers do not wish to convey); *Pac. Gas & Elec. Co. v. Pub. Utility Comm'n of Cal.*, 475 U.S. 1 (1986) (state may not require privately owned utility to include in its billing envelopes speech of a third party with which it disagrees); *Wooley v. Maynard*, 430 U.S. 705 (1977) (state cannot compel citizens to display state motto on license plates); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) (state cannot require newspaper to run rebuttals to its editorials); *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943) (public school students may not be compelled to recite Pledge of Allegiance); *see also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 644 (2000) (public accommodations law that required Boy Scouts to readmit homosexual member violated Boy Scouts' First Amendment right of expressive association).  To the extent that the PSC's speech presumptively reflects the views of the majority of its members, plaintiffs are free to dissent, and have exercised that right.  *See, e.g.*, Avraham Goldstein, *I'm Stuck with an Anti-Semitic Labor Union*, Wall Street J. (Jan. 21, 2022), https://www.wsj.com/articles/im-stuck-anti-semitic-semitism-public-labor-union-intimidation-dues-cuny-city-university-new-york-janus-11642714137 (last visited November 29, 2022).

to affiliate, *see* Compl. ¶ 68.  In support, plaintiffs cite cases giving public employees the right

not to be discharged for refusing to support a political party or its candidates.  *See, e.g.*, *Elrod v.*

*Burns*, 427 U.S. 347 (1976) (First and Fourteenth Amendments violated where non-civil-service

employees were threatened with discharge for failure to affiliate with Democratic Party); *Rutan*

*v. Republican Party of Ill.*, 497 U.S. 62 (1990) (promotions, transfers, and recalls based on

political affiliation or support are impermissible infringements on public employees' First

Amendment rights; conditioning hiring decisions on political belief and association violates

applicants' First Amendment rights absent vital governmental interest); *O'Hare Truck Serv., Inc.*

*v. City of Northlake*, 518 U.S. 712 (1996) (governmental retaliation against city contractors for

exercising rights of political association or expression impermissible).

These cases, however, are far afield.  Each involves a state actor's consideration of the

political affiliation of an employee or applicant to favor or penalize their career prospects.  There

is no analog alleged here.  Quite the contrary, the Complaint is notably devoid of any claim that

non-union instructors in the bargaining unit have been, or stand to be, treated in any way

disadvantageously relative to members (or supporters) of the union.[11]  Nor does it plead any facts

indicating that instructors have been differentially treated based on political affiliation or point of

view.  The Complaint instead faults New York for treating the non-union-member instructors *in*

*pari passu* with the union instructors, as common members of the bargaining unit.  Notably, too,

although the Complaint states that the six plaintiffs subjectively doubt the PSC can ably serve as

a fiduciary for them in negotiating terms and conditions of employment, Compl. ¶ 43, it does not

---

[11] To the extent the professors argue that they, as non-members, are treated "worse" than
members owing to a 2019 amendment to the Taylor Law which limits the PSC's duty to non-
members in individualized grievance settings, that argument is addressed *infra* Section III.D.4.

allege that any have experienced adverse consequences from their decisions to resign from the PSC.

### 4.    Facial Challenge to the Taylor Law's Section 209-a.2

Plaintiffs' final theory is of a different character. They contend that a 2019 amendment to the Taylor Law, *see* N.Y. Civ. Serv. Law § 209-a.2, gives rise to a facial First Amendment violation.[12]  That amendment states that the union designated as the exclusive bargaining representative owes "non-members" or the bargaining unit a duty of fair representation "limited to the negotiation or enforcement of the terms of an agreement with [their] public employer," *id.* § 209-a.2(c). But, it states, such a union is not required to provide representation to non-members in situations that involve "questioning by the employer," "in statutory or administrative proceedings or to enforce statutory or regulatory rights," or "in any stage of a grievance, arbitration or other contractual process concerning the evaluation or discipline of a public employee where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate." *Id.* § 209-a.2(c)(i)–(iii).

Plaintiffs contend that this provision—added in the wake of the *Janus* decision—authorizes the PSC to "treat [the CUNY Professors] less favorably than PSC members, solely because they have exercised their constitutional rights to become or remain non-members," Compl. ¶ 53, and that such violates the First Amendment. As plaintiffs put the point: "This state of affairs leaves [plaintiffs'] and other non-members' interests vulnerable to arbitrary and discriminatory union conduct," Pl. Response MTD at 12, notwithstanding the admonition in

---

[12] Although neither the Complaint nor plaintiffs' memorandum of law denotes the challenge as facial, counsel at argument agreed that the challenge is necessarily facial. *See* Tr. at 17, 47.

*Janus* that the "duty of fair representation is a necessary concomitant of the authority that a union

seeks when it chooses to be the exclusive representative," *Janus*, 138 S. Ct. at 2456.[13]

Plaintiffs' argument based on *Janus* is unpersuasive, as § 209-a.2, as amended, in fact

responds to the analysis in *Janus*. Addressing a union's duty of fair representation to members

and non-members, the Court there held: "What this duty entails, in simple terms, is an obligation

not to act solely in the interests of [the union's] own members." *Id.* at 2467 (cleaned up). The

Court further made clear that a union henceforth is at liberty to decline to represent non-members

in the grievance process, thereby eliminating the risk, after *Janus*, of freeriding by a non-member

who declined to pay agency fees. "[W]hatever unwanted burden is imposed by the

representation of non-members in disciplinary matters can be eliminated through means

significantly less restrictive of associational freedoms. Individual non-members could be

required to pay for that service *or could be denied union representation altogether*." *Id.* at 2468–

69 (emphasis added) (cleaned up).

The amendment to the Taylor Law adopts the approach invited by *Janus*. It does so by

limiting the public employee union's duty to represent non-members, so as to apply to collective

bargaining, but not to individualized proceedings such as disciplinary grievances. To this end,

§ 209-a.2 states that a union need not represent a non-member "during questioning by the

employer," N.Y. Civ. Serv. Law § 209-a.2(c)(i), "in statutory or administrative proceedings or to

enforce statutory or regulatory rights," *id.* § 209-a.2(c)(ii), and "in any stage of a grievance,

arbitration or other contractual process concerning the evaluation or discipline," *id.* § 209-

a.2(c)(iii), "where the non-member is permitted to proceed without the employee organization

---

[13] At argument, plaintiffs acknowledged that this challenge is unlike that in *Steele v. Louisville & Nashville Railroad Co.*, 323 U.S. 192 (1944), which held that a union could not exclude or deny equal treatment to non-union members based on a protected classification. *See* Tr. 39–40.

and be represented by his or her own advocate," *id.* Plaintiffs' claim that § 209-a.2 as amended is inconsistent with *Janus*'s reminder that a union must discharge its duty of fair representation thus overlooks the line the Court in *Janus* drew between collective and individualized proceedings. Read on its face and evaluated in light of *Janus*, § 209-a.2 faithfully applies *Janus*. It does not infringe on the rights of a non-member, whether to free speech and expression under the First Amendment or to fair representation.[14]

In a bid to avoid this result, plaintiffs suggest that the final clause of the amended section—"where the non-member is permitted to proceed without the employee organization and be represented by his or her own advocate"—might be read to modify only § 209-a.2(c)(iii), and not § 209-a.2(c)(i) and § 209-a.2(c)(ii). That construction is textually unpersuasive. *See Am. Int'l Grp., Inc. v. Bank of Am. Corp.*, 712 F.3d 775, 782 (2d Cir. 2013) ("When there is no comma, as in the statute considered in *Barnhart* [*v. Thomas*, 540 U.S. 20, 26 (2003)], the subsequent modifier is ordinarily understood to apply only to its last antecedent. When a comma is included, . . . the modifier is generally understood to apply to the entire series."). And even if § 209-a.2 were ambiguous on this point, the canon of constitutional avoidance would dictate the same outcome. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *Clark v. Martinez*, 543 U.S. 371, 380–81 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court."). That is because the

---

[14] With this caveat: The parties have not drawn to the Court's attention case law construing the amended § 209-a.2. *See* Tr. 63. Should that provision be construed differently than the Court has here and so as to intrude on the duty of fair representation, the above analysis would not apply.

reading the professors suggest—under which a union would be permitted not to represent the non-member in settings where the member was not allowed to "be represented by his or her own advocate"—would leave the non-member unassisted "during questioning by the employer," N.Y. Civ. Serv. Law § 209-a.2(c)(i), and "in statutory or administrative proceedings or to enforce statutory or regulatory rights," *id.* § 209-a.2(c)(ii). The constitutional questions potentially raised under *Janus* by this reading are, however, avoided by construing the final clause to apply to all of § 209-a.2's subsections. Consistent with this, the Complaint does not allege that non-members of the PSC have been denied representation by the PSC, where they *cannot select their own advocate for representation*, in any category of individualized proceeding described in § 209-a.2.[15]

The Court therefore rejects plaintiffs' final theory of a First Amendment violation. New York's statutory amendment restricting the scope of a public employee union's obligatory representation of non-members is, on its face, in accord with *Janus*. There is no basis to hold that it breaches the First Amendment rights of the non-members.

Plaintiffs' First Amendment challenges to their representation by the PSC and inclusion in the bargaining unit alongside members of the PSC, as brought in Counts One and Two, therefore fail to state a claim. These Counts must be dismissed.

## IV.     Status of Certain Plaintiffs' Improper Dues-Deduction Claims (Count Three)

The scope of Count Three has narrowed substantially since the filing of the Complaint, as a result of concessions by the parties and plaintiff Goldstein's acceptance of an offer of judgment by the City.

---

[15] The PSC's collective bargaining agreement, which the Complaint attaches and incorporates, *see* CBA, is in accord. In Section 21.3, it provides that an employee, whether or not a union member, can choose to be represented by either an attorney or a union representative in grievance proceedings. CBA at 57.

At the outset, three plaintiffs—Goldstein, Kass-Shraibman and Langbert—sought prospective and retroactive relief against the PSC, DiNapoli, and the City. *See* Compl. ¶¶ 108–18. In their reply to the motions to dismiss, plaintiffs conceded that their Count Three "claims for prospective relief are not justiciable," Pl. Response MTD at 33. Goldstein then accepted an offer of judgment from the City, in the amount of $223.35, "plus reasonable attorneys' fees, expenses, [and] costs in an amount to be determined by the Court." Dkts. 77, 78.[16]

This leaves intact—as the parties have confirmed in a joint letter, *see* Dkt. 80, and at argument, *see* Tr. at 5—only the claims for retroactive relief by the three plaintiffs[17] against the PSC. *See* Dkt. 80. The PSC did not move to dismiss these claims. *See* PSC Reply MTD at 12. Therefore, the Court denies as moot all motions to dismiss as to Count Three.

## CONCLUSION

For the reasons above, the Court grants defendants' motions to dismiss in full. The Court therefore dismisses Counts One and Two, and the portions of Count Three on which defendants have moved.

The case will now proceed to discovery on the surviving portion of Count Three, which is limited to the claims against the PSC by Goldstein, Kass-Shraibman, and Langbert, with respect to dues and interest allegedly deducted from their wages after their resignations from the union. Because no live claims remain against any defendants other than the PSC, the Court accordingly dismisses all other defendants from this case. The Court directs counsel for the remaining parties

---

[16] Goldstein moved shortly thereafter for an award of attorneys' fees and costs. Dkt. 84. In the interests of economy and consistency, the Court will not entertain any such motion until Count Three, whose resolution could prompt further motions for fees and costs, has been resolved.

[17] Goldstein has indicated, in the latest joint letter, Dkt. 80 at 1, that he plans to drop his remaining claim against the PSC.

(Goldstein, Kass-Shraibman, Langbert, and the PSC) to jointly submit, by December 9, 2022, a proposed case management plan contemplating, *inter alia*, the completion of discovery on the remaining claim by February 9, 2023.

The Court respectfully directs the Clerk of the Court to close the motions pending at docket numbers 53, 56, and 59, and to terminate the City of New York, CUNY, DiNapoli, Wirenius, Townley, and Zumbolo as defendants in this matter.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: November 30, 2022
      New York, New York